James A. Roe, J.
This is a proceeding under article 78 of the Civil Practice Act to review and annul the determination of respondent, the Commissioner of Hospitals of the City of New York, refusing’ to renew petitioners’ annual license to conduct a private proprietary hospital and to compel him to issue such a license.
According to the petition and documents thereto annexed, petitioner Kew Gardens Sanitarium, Inc. (hereinafter referred to as the Sanitarium) is a domestic stock corporation and the owner and operator of Kew Gardens General Hospital (hereinafter referred to as the Hospital), a private proprietary hospital which is located in Kew Gardens in this county. The Hospital has been in continuous operation since 1941 under an annual *744 license which has until recently been renewed without interruption.
By letter dated November 9, 1962, respondent notified petitioners that the license would not be renewed on February 15, 1963, unless the lease of the premises upon which the Hospital is being operated and the sublease of space within those premises were amended to eliminate the percentage rentals therein provided. Neither the lease nor the sublease has been so amended. A 90-day provisional license was issued by respondent on February 15,1963.
On December 20, 1940, the Sanitarium, as tenant, and Kew Gardens Corporation, as landlord, entered into a lease for a 21-year term commencing on January 1, 1941 with an option to renew for a further term of 15 years, the rental to be based upon stated percentages of graduated gross receipts with a minimum base rental. That lease was modified by a written agreement executed on August 21, 1961, between the Sanitarium, as tenant, and Kew Gardens'Enterprises, a limited partnership, as landlord. As modified, the lease was to expire on December 31, 1982, with an option to renew for an additional 15 years, such option to be exercised pursuant to the terms of the original lease, and also provided for the payment of rent based upon stated percentages of graduated gross receipts with a minimum base rental. The modified lease and the original lease contain the following identical provision: “ The term 1 gross receipts’ * * * shall not be deemed to include receipts from patients for the use of the telephone other than service charges made by the hospital (not to include toll charges); receipts from x-ray or x-ray therapy, other than actual receipts by the hospital for the use of the x-rays, x-ray therapy, physiotherapy and pathology departments; receipts from patients for services of special nurses employed by them and/or supplied by the hospital; receipts from patients to cover for services of doctors employed by them.”
Under a sublease which was executed on December 15, 1955, Doctors Fuhrman and Sumers, individually and as copartners, agreed to conduct, operate and maintain a radiology department at the Hospital at an annual rental of “ twenty-one and two-tenths percent (21.2%) of the annual gross receipts of [the] Radiology Department ”. That instrument also provided as follows: “ The words 1 gross receipts of the Radiology Department ’ * * * of which the Sanitarium is entitled to receive twenty-one and two-tenths percent (21.2%) thereof as rental for the leased space, is intended for all of the purposes of this *745 agreement to be, and shall be confined, solely to the said income derived from the Associated Hospital Service patients confined to the Kew Gardens Hospital, as aforesaid, all fees from private as well as compensation patients earned in the Radiology Department and to all other professional fees earned in said Radiology Department, and to none other. ’ ’ The original term of the sublease expired on December 26, 1961. The exercise by the Sanitarium of its option to renew the major lease ipso facto renewed the sublease for a like term.
The Sanitarium, continues the petition, is operating the Hospital in full compliance with section 35-b of the Social Welfare Law and the sole reason for respondent’s refusal to renew the license is the failure of the Sanitarium to amend the leases as requested. Such refusal by the respondent is then stated to be arbitrary and capricious, contrary to law and unconstitutional in that it is an attempt to impair the obligations of a contract and to deprive petitioners of their property without due process of law.
Respondent’s answer consists of general and specific denials and six affirmative defenses which are unnecessary to specify because the bases of respondent’s action and the questions raised is this proceeding are accurately reflected in the following two paragraphs from respondent’s memorandum of law:
“ The Commissioner of Hospitals determined that this participation by the landlord in the gross receipts of the hospital as well as the fees received by doctors for professional service rendered to patients was in violation of Section 35-b of the Social Welfare Law which limits the right to profit from the operation of a private proprietary hospital to physicians and Section 42 of the Hospital Code and Regulations which requires that only physicians duly licensed to practice medicine in the State of New York shall have a proprietary interest in the operation of the private proprietary hospital. The Commissioner of Hospitals also found that the participation by the landlord in the profits of the hospital rendered the landlord a partner in the operation of the hospital although it assumed none of the responsibilities imposed by statute upon a licensee. It is also clear that the landlord’s participation in the fees received by the doctors in the Radiology Department is highly improper if not unethical.
“ When the petitioner refused or failed to have its lease agreement revised so that the rent arrangement did not effectuate a participation in the profits of the hospital or in the professional fees received by doctors of the Radiology Department the Commissioner of Hospitals refused to renew the license for the *746 operation of the Kew Gardens General Hospital. From that denial the petitioners instituted the instant Article 78 Civil Practice Act Proceeding.”
In the supporting affidavit of Emanuel L. Sperber, a certified public accountant and a general partner in Kew Gardens Enterprises, the landlord, he states that the practice of percentage leasing has been established in the United States and other parts of the world for the past hundred years and is only a means of helping to establish a rental on a fair and equitable basis for the use of real property. He also states that the major lease has been assigned to a savings institution as additional security for a first mortgage loan which was made in order to build and finance an extension for the Hospital which has just been completed.
In his affidavit, petitioner Ziviello, the Sanitarium’s designee for the Hospital license, states that Kew Gardens General Hospital, with a bed capacity of 240, has been serving the County of Queens for the past 21 years. It is one of the foremost proprietary institutions in the City of New York and in 1956 became the first proprietary hospital in the County of Queens to be fully accredited by the Joint Commission on Accreditation of Hospitals. On April 10,1959, the State Department of Mental Hygiene approved the psychiatric service of the Hospital under section 202 of the Mental Hygiene Law, the only proprietary general hospital so approved by a State agency. The Hospital is the first and only proprietary general hospital in the County of Queens which has been approved for a residency training program in pathology by the American Medical Association. The Hospital’s high standing is further indicated by the commendation which it received in 1960 by the Board of Regents of the American College of Surgeons.
Subdivision 2 of section 583-a of the New York City Charter authorizes the respondent to license private proprietary hospitals as well as other institutions, and subdivision a of section 583-d authorizes the Board of Hospitals to promulgate a hospital code which “ shall consist of such rules and regulations, not inconsistent with the constitution or the laws of this state or with this charter, as may be necessary to carry out the powers and duties vested by law in the department of hospitals and the board of hospitals.” Article III of the “ hospital code op the city op new york and regulations ” covers private proprietary hospitals. Section 41 contains the general provisions for licensing: subdivision 1 of section 42 provides, in pertinent part, that the application for a license, “ except as otherwise provided in this article, shall show that the applicant and all persons having a *747 proprietary interest in the operation of the hospital are physicians duly licensed to pradtice medicine in the State of New York, residents of the State of New York, of reputable character, financially responsible and able to comply with the minimum standards established by the rules and regulations promulgated by the Board of Hospitals”; and subdivision 6 of section 43 pertinently provides that “Notwithstanding the provisions of Section forty-two Subdivision one of this chapter, a renewal license will be granted to the licensee of a proprietary hospital which has been in operation lawfully on the date this code takes effect, provided however, that there is compliance with all other provisions thereof which are applicable to the renewal of licenses.” That code went into effect on October 1, 1956.
The question of prime importance, therefore, is whether the Hospital was in lawful operation on that date.
Sedtion 35-b of the Social Welfare Law, which was added by chapter 301 of the Laws of 1956, provides as follows: “ Only physicians duly licensed by the state department of education and partnerships of such physicians may operate hospitals for profit, except such hospitals as are in operation on the date this section tahes effect which are licensed pursuant to any law or are opproved by the state department of social welfare. Notwithstanding the foregoing, any such partnership of two or more physicians may also include not more than one dentist duly licensed by the state department of education.” (Emphasis supplied.)
This section went into effect on April 4, 1956. Respondent admits that the Sanitarium “ has been the operator of a private proprietary hospital through a license issued to the petitioner, Alphonse Ziviallo by the Department of Hospitals ” and there is no question that the Sanitarium operated the Hospital long-prior to the effective date of section 35-b. As such, it comes within the express exception provided in that section to which emphasis has been supplied above. The Sanitarium is therefore entitled to continue to be licensed to operate the Hospital unless it has somehow forfeited that right by virtue of the lease agreements in question. This court does not believe that it has.
The Hospital does not practice medicine. In Matter of Yanover v. MacLean (4 Misc 2d 379), Mr. Justice Gold held that a sanitarium which merely furnished board, lodging, care and nursing was not practicing medicine. In the instant case, Dr. Ziviallo states in his affidavit that 11 The Hospital per se does not accept patients for medical and surgical care. It lends its facilities to patients of medical doctors and surgeons who alone do all the medical and surgical work and who alone charge for *748 medical and surgical care given to the patients. All that the hospital charg-es is for making available its hospital facilities and incidental hospital services and for that it receives regular standard rates per diem which are paid by either the Blue Cross or the patients. It never docs charge for or receive anything for the actual medical and surgical services performed for the patients. These services are paid exclusively and only to the medical doctors and surgeons who perform these services.” One of petitioners’ attorneys states in his affidavit that “The corporate petitioner here [i.e., the Sanitarium] does not practice medicine. It maintains and operates a proprietary hospital for profit where licensed physicians use the facilities of that hospital to bring in their patients and attend to their needs. The medical care and surgical treatment at the Kew Gardens General Hospital are administered by the patients’ physicians and surgeons and the hospital merely furnishes board, lodging, care and nursing. The hospital does not charge for medical or surgical care. It only charges for the hospital facilities it provides for the patients of the medical doctors, who alone are charging and are paid for any medical or surgical services they render to their patients. Most of these patients are Blue Cross subscribers and this court can take judicial notice of the fact that Blue Cross merely pays the hospitals for the room and meals and such incidental expenses as are connected with providing hospital facilities by the hospitals, but does not pay the hospitals for medical or surgical care of the patients.” (Emphasis in original.)
The respondent contends that Bing v. Thunig (2 N Y 2d 656) has overruled the holding of Mr. Justice Gold in Matter of Yanover (supra). Bing v. Thunig, as this court reads it, did not hold, as respondent contends “ that a hospital in its operation engaged in what it termed a * medical act ’ as opposed to what was previously considered to be a purely 1 administrative act’.” Judge Fuld, writing for a majority of the Court of Appeals noted (p. 661) that “ the failure of the nurses * * * to inspect and remove the contaminated linen might, perhaps, be denominated an administrative default” and Chief Judge Con way concurred in the result upon the specific ground that the nurses’ failure “ was an administrative default ” (p. 667). What Bing v. Thunig did was to abandon the court-made rule that a hospital (first charitable and later private) was immune from liability for torts committed by one of its employees in the performance of a medical as distinguished from an administrative acfi As Judge Fuld wrote (pp. 666-667): “Hospitals should, in short, shoulder the responsibilities borne by everyone *749 else. There is no reason to continue their exemption from the universal rule of respondeat superior. The test should be, for these institutions, whether charitable or profit-making, as it is for every other employer, was the person who committed the negligent injury-producing act one of its employees and, if he was, was he acting within the scope of his employment. ’ ’ Bing v. Thunig does not, therefore, hold that all hospitals are engaged in the practice of medicine. (See Education Law, § 6501, subd. 4)
Whether a hospital is or is not practicing medicine depends upon the facts of the particular case. Upon the facts in this case, as they have been adduced on behalf of the petitioners and not refuted by affidavit of the respondent “ showing such evidentiary facts as shall entitle him to a trial of any issue of fact ” (Civ. Prac. Act, § 1291), the court holds that the Hospital involved in the instant case does not practice medicine. Such being the case, there is no basis for holding the major lease invalid upon the ground that the landlord is unlawfully participating in the practice of medicine.
Nor is the lease invalid on the ground that by its percentage rental provisions the landlord is participating in the operation of a private proprietary hospital in contravention of section 35-b of the Social Welfare Law. That section expressly provides that only duly licensed physicians (with the exception discussed above but which is not germane to the present discussion) “ may operate hospitals for profit ” (emphasis supplied). This landlord does not operate this Hospital nor does it have anything to say about its operation. So far as appears, the landlord and the Sanitarium dealt at arm’s length in executing the lease and neither its execution nor its terms are even suggested to be other than as they appear. This court is thus unable to see how the percentage rental provisions place the landlord in any different position so far as the operation of the Hospital is concerned than would fixed rental provisions.
Nor does the fact that some of the gross receipts of the Sanitarium are obtained from the conduct of the radiology department by Doctors Fuhrman and Burners under the sublease require a different result. Section 6514 of the Education Law, while not determinative of this issue, reflects the public policy of this State and points the way to the correct result. Subdivision 2 of that section provides that ‘1 The license or registration of a practitioner of medicine, osteopathy or physiotherapy may be revoked, suspended or annulled or such practitioner reprimanded or disciplined in accordance with the provisions and procedure of this article upon decision after due hearing” in *750 any of the eases thereafter specified. Specifically excepted from paragraph (f) of subdivision 2 is the ‘ ‘ payment, not to exceed thirty-three and one-third per centum of any fee received for x-ray examination, diagnosis or treatment, to any hospital furnishing facilities for such examination, diagnosis or treatment.” The radiologists in the case at bar were obligated to pay hut 21.2% of their gross receipts (well below the statutory 33%% maximum) to the Sanitarium, which is in fact the Hospital. Thus the sublease is neither unlawful nor unethical as between the Sanitarium and its sublessees. Such being the case, it can hardly be said that the inclusion of the rent for the radiology department in the gross receipts of the Sanitarium, upon which its percentage rental is based, is improper or unethical since neither the Sanitarium nor the landlord is engaged in the practice of medicine.
In view of the foregoing, the petition is granted, respondent’s determination is annulled and respondent is directed to issue an annual license for the operation of the Hospital.